## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| VICTORIA PROKOP and<br>WAYNE COGLIANESE, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 21-cv-450 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| BRANDON HILEMAN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This case is about a search of a home, gone wrong. The police executed a search warrant at the home of Joseph Gravelle, a suspected drug dealer. Except that it wasn't his home. It was his *former* home. Plaintiffs Victoria Prokop and Wayne Coglianese lived at the residence in question. And they were surprised to see the police at their door.

When the police showed up, Prokop and Coglianese didn't believe that they were the police. The officers were in plain clothes, and the copy of the warrant was illegible. It was right before Halloween, and Prokop and Coglianese thought that they were getting robbed.

When Prokop and Coglianese attempted to close the door, the police forced themselves in. A major fracas ensued, involving both fight and flight. The police fought with Coglianese, and eventually subdued him and placed him in handcuffs. Prokop, meanwhile, fled the home with her cell phone, and called 911. The officers on the scene spoke with the 911 operator, and said what was happening.

After a few minutes, Prokop and Coglianese realized that the police really were the police. And the officers, for their part, realized that Prokop and Coglianese weren't Gravelle.

The police realized that they were in the wrong home. The Chief of Police then showed up, and apologized. The officers then left.

Prokop and Coglianese responded by filing suit against seven Hometown police officers and the City of Hometown. They sued a Summit police officer and the City of Summit, too. They alleged a collection of claims under the Fourth Amendment and under state law. The Hometown Defendants and the Summit Defendants, in turn, moved to dismiss.

For the following reasons, both motions are granted in part and denied in part.

## Background

At the motion to dismiss stage, the Court must accept as true the well-pleaded allegations of the complaint. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

## I.    The Plaintiffs and Their Home

In March 2018, Plaintiff Victoria Prokop bought the house at 8840 South Ryan Road in Hometown, Illinois, and has lived there ever since. *See* Cplt., at ¶ 16 (Dckt. No. 1). Two years later, in March 2020, Plaintiff Wayne Coglianese moved in with her. *Id.* at ¶ 27. The home is a duplex with a garage and a driveway, and the garage is visible from the street. *Id.* at ¶¶ 16–17.

Before Prokop purchased that home, Joseph Gravelle lived there. *Id.* at ¶ 20. Allegedly, Gravelle is a known drug dealer in the neighborhood. *Id.* at ¶ 21. After Prokop bought the place, Gravelle moved a few doors down (to 8885 South Ryan Road). *Id.* at ¶¶ 23–26. Plaintiffs have no relationship or association with Gravelle. *Id.* at ¶ 28. They just live in his old house.

## II.     The Search Warrant

On October 30, 2020, Defendant Brandon Hileman (a Hometown police officer) applied for a search warrant from the Circuit Court of Cook County.  *Id.* at ¶¶ 6, 31.  Specifically, he asked to search Joseph Gravelle and the premises of *8840* South Ryan Road.  *Id.* at ¶ 31.

Notice the address.  At that point, 8840 South Ryan Road was the *former* home of Gravelle, and was the then-current home of Prokop and Coglianese.  Gravelle hadn't lived there for more than two and a half years.  *Id.* at ¶¶ 20, 22.

The application for a search warrant included the factual basis for the request. Apparently, a confidential informant ("John Doe") spoke with Hometown's Chief of Police, Defendant Louis Dominguez, on October 27, 2020, meaning three days earlier.  *Id.* at ¶¶ 7, 32. According to John Doe, Gravelle had 6–10 marijuana plants growing in his garage.  *Id.* at ¶¶ 33– 34.  They were 3–4 feet tall, and were only two weeks away from harvest.  *Id.* at ¶ 34.

John Doe added that Gravelle is a drug dealer who peddled marijuana, synthetic heroin, and steroids.  *Id.*  John Doe also divulged that Gravelle uses his vehicle to transport drugs.  *Id.* And most importantly, John Doe said that Gravelle "uses the house to store synthetic heroin and steroids."  *Id.*

The application for the search warrant also summarized a second conversation between John Doe and law enforcement.  On October 29, 2020, the day before the warrant request, John Doe spoke with Defendant David Lis, a detective.  *Id.* at ¶ 35.  John Doe shared that he saw marijuana plants in Gravelle's garage on October 29, 2020 at 8:00 p.m.  *Id.*

Hileman never independently verified any of the information from John Doe.  *Id.* at ¶ 70. None of the other Defendants did, either.  *Id.* at ¶ 71.  They never performed a title search, which would have revealed that Prokop – not Gravelle – owned the property in question, meaning 8840

3

South Ryan Road. *Id.* at ¶ 72. They didn't conduct a Google search, check with the utility company, or search a database (like Accurint, Spokeo, or LexisNexis) to verify Gravelle's address. *Id.* at ¶¶ 73–75.

The search warrant was subscribed and sworn (the complaint does not say by whom) on October 30, 2020 at 3:15 p.m.[1] *Id.* at ¶ 38. The state court issued the warrant. *Id.* at ¶ 39.

With the warrant in hand, officers from the Hometown Police Department met to discuss the plan to search 8840 South Ryan Road. The group included seven officers: Defendants Hileman, Dominguez, Lis, James Sullivan, John Borgens, Timothy Casey, and Marcin Stafira. *Id.* at ¶ 39. Again, Dominguez is the Chief of Police. *Id.* at ¶ 7. Hileman, Lis, Sullivan, and Borgens are detectives. *Id.* at ¶¶ 6, 8, 9, 10. Casey and Stafira are police officers. *Id.* at ¶¶ 11, 12.

The officers then set up surveillance at 8840 South Ryan Road, meaning Gravelle's *former* home and the then-current home of Prokop and Coglianese. *Id.* at ¶ 40. The stakeout began around 5:00 p.m. *Id.* at ¶¶ 41, 88. One police vehicle was near the residence, and other vehicles were parked nearby. *Id.* According to the police report, they waited for two hours without seeing Gravelle. *Id.* at ¶ 41.

## III. The Traffic Stop

Meanwhile, as the officers waited, at 5:35 p.m. that same day, Prokop was driving in her car in Hometown. *Id.* at ¶ 42. A marked Hometown police car pulled her over, and Officer Stafira approached her vehicle. *Id.* at ¶¶ 43–44. Stafira told Prokop that she did not use her turn

---

[1] Plaintiffs admit that they do not know much about the confidential informant, and allege several potential facts in the alternative. They suggest that (1) he may have been made up; (2) he may have given different information than the police suggested; (3) he may have lied to the police; (4) the police may have told him to lie; or (5) the police may have lied about the information that he gave them. *See* Cplt., at ¶¶ 141–52 (Dckt. No. 1). No matter what really happened, Plaintiffs allege that Defendants knew that the information used for the search warrant was false and used it anyway. *Id.* at ¶ 153.

signal. *Id.* at ¶ 46. But the dash camera video shows that she did, in fact, use her turn signal. *Id.* at ¶¶ 47–48.

During the stop, Stafira asked for her license, registration, and insurance. *Id.* at ¶ 49. Prokop's license listed an old address (that is, not 8840 South Ryan Road). *Id.* at ¶ 51. But she had updated the Illinois Secretary of State website to show 8840 South Ryan Road as her current address. *Id.* at ¶¶ 52, 55. Stafira ran Prokop's license, seemingly noticed the difference in address, and asked Prokop if the address on her license was correct. *Id.* at ¶¶ 53–54. Prokop explained that it was wrong, and that she had changed it online to the correct address. *Id.* at ¶ 55. She also told Stafira that she bought the home at 8840 South Ryan Road. *Id.* at ¶ 56. After all that, Stafira let Prokop off with a warning. *Id.* at ¶ 47.

The complaint alleges that Stafira told the other officers what happened during the stop. *Id.* at ¶ 58. That is, Prokop believes Stafira "told the other Defendant Officers of what had occurred at the traffic stop and had told them that Plaintiff Prokop resided at 8840 S. Ryan Road." *Id.*

The complaint doesn't explain why Stafira told the other officers about the traffic stop. On its face, the traffic stop would seem to be unremarkable. But reading between the lines, and with the benefit of the response brief, it seems that Stafira was part of the stakeout of the home. *Id.* at ¶ 39. And once the group saw Prokop drive away from the home – meaning the home that was involved in the stakeout – Stafira pulled her over. And then he told the group what had happened.

That reading isn't the only way to read the complaint. But it is a plausible reading. And if something else happened that is important, Plaintiffs can amend.

After Stafira let her go, Prokop went to the grocery store. *Id.* at ¶ 76. Plaintiffs allege, on "information and belief," that unspecified "Defendant Police Officers" followed her into the store. *Id.* at ¶ 77. Plaintiffs don't explain how some or all the officers followed her into the store while also staking out their house. Regardless, the complaint does not allege that anything important happened in the store, apart from some possible shopping for the soon-to-be BBQ. When she finished shopping, Prokop returned home to 8840 South Ryan Road. *Id.* at ¶ 78.

## IV. The Home Entry

When she got home, Prokop prepared dinner using an outdoor barbeque. *Id.* Both Prokop and Coglianese made multiple trips in and out of the house, and any passerby could see them from the street. *Id.* at ¶¶ 79–80.

Prokop also left the garage door open. *Id.* at ¶ 82. A passerby could see the open garage from the street, too. *Id.* at ¶ 83. Plaintiffs left the garage door open the entire time they were cooking, and they left it open when they returned inside after finishing their barbecue. *Id.* at ¶ 84. Plaintiffs didn't keep any marijuana plants in the garage, and they allege that any person looking into the garage could have seen the absence of marijuana plants. *Id.* at ¶¶ 85–86. But Hileman's police report did not mention that there were no plants in the garage. *Id.* at ¶ 87.

Meanwhile, the police spent two hours surveilling the property. *Id.* at ¶ 41. At 7:00 p.m., three Hometown police officers (Lis, Sullivan, and Hileman) and one Summit police officer (Andrew Kosmowski) – approached 8840 South Ryan Road to execute the search warrant. *Id.* at ¶¶ 13, 88. As an aside, the complaint does not reveal why an officer from the City of Summit (Kosmowski) participated in a search of a home in Hometown.

The officers had a search warrant. *Id.* at ¶¶ 39, 88, 96, 99. But they weren't wearing masks, despite the ongoing COVID-19 pandemic. *Id.* They weren't wearing body cameras, either. *Id.* at ¶ 89. And they weren't wearing uniforms. *Id.* at ¶¶ 88, 97, 106

Lis, Sullivan, and Kosmowski approached the side door. *Id.* at ¶ 90. From their location, the open garage door (and empty garage, presumably) was in full view. *Id.*

Lis knocked on the side entrance, which contained an outer glass door and an inner solid door. *Id.* at ¶ 93. Prokop opened the solid door, but left the glass door shut. *Id.* at ¶¶ 94–95. So, she could see the officers, and the officers could see her, but the entryway wasn't open.

Lis announced that they were police officers and had a warrant to search the house. *Id.* at ¶ 96. The officers were wearing plain clothes under their vests, and Prokop had no reason to believe that she had committed any crimes. *Id.* at ¶ 97. So, because the event took place right around Halloween, Prokop did not believe them. *Id.* Instead, she suspected foul play, and thought she was getting robbed. *Id.*

Prokop told the group at the door that they weren't the police. *Id.* at ¶ 98. She made that statement hoping to get the attention of Coglianese, who was in the living room. *Id.* Lis, in turn, responded that they were, in fact, police officers. *Id.* at ¶ 99. To prove the point, and explain why they were there, Lis showed Prokop a copy of the search warrant. *Id.*

If Lis was hoping to alleviate Prokop's concerns, it backfired. Instead of verifying who they were, and why they were there, the copy of the search warrant made Prokop even more suspicious.

The copy of the warrant apparently wasn't the best. The background was dark grey – "almost black" – and the typed words were barely legible. *Id.* at ¶ 100. A reader needed the paper close to her face to make out what it said. *Id.* As a result, Prokop became further

convinced that the men at her door were lying about being police officers. *Id.* at ¶ 101. She refused to give her name. *Id.* at ¶ 102.

Up to that point, Prokop was handling the whole situation, while Coglianese was in the living room. But Coglianese heard something, so he went to the door to see what was going on. *Id.* at ¶ 103. He saw a Defendant holding up what looked like a "black piece of paper." *Id.* at ¶ 104. Lis said that they were police officers and that they had a search warrant. *Id.* at ¶ 105.

But Coglianese didn't believe them, either. *Id.* at ¶ 106. He was skeptical for a number of reasons, including "the closeness in time to Halloween, the lack of uniform, the plain clothes under the vest, the black piece of paper that was being claimed by the Defendants as a search warrant, and the fact that he was not engaged in any illegal activity." *Id.*

So, Prokop and Coglianese attempted to close the solid door and go about their night. *Id.* at ¶ 107. But Defendants opened the glass door first, and entered the home. *Id.* at ¶ 108.

Chaos ensued. Lis and Kosmowski fought with Coglianese. *Id* at ¶ 109. The officers eventually subdued him, and placed him in handcuffs. *Id.* at ¶ 110.

Meanwhile, Prokop ran to the living room and dialed 911 on her cell phone. *Id.* at ¶ 113. She then fled the home, running out the front door. *Id.*

Around this time, as the inside of the house turned to pandemonium, Officer Hileman entered the home through the side door, too. *Id.* at ¶ 111. From that vantage point, Hileman would have been able to see that there were no marijuana plants in the garage. *Id.* at ¶ 112.

At 7:04 p.m., four minutes after the police knocked on the door, Prokop connected with the 911 operator. *Id.* at ¶ 114. The call was recorded. *Id.* at ¶ 116.

Prokop told the 911 operator that people who claimed to be the police had entered her home with an alleged search warrant. *Id.* at ¶ 115. Lis then exited the house and spoke to the

911 operator using Prokop's phone, and he apparently explained the situation. *Id.* at ¶ 117. At that point, Prokop began believing that the people in her home were, in fact, police officers. *Id.* at ¶ 118.

So, finally believing that the people in her home were police officers, Prokop reentered the house with Lis. *Id.* at ¶ 119. Both Prokop and Coglianese gave their names to the police, and the officers kept them in their living room for questioning. *Id.* at ¶¶ 119–20. They were not free to leave. *Id.* at ¶ 120. Eventually, the officers uncuffed Coglianese, and he and Prokop showed the officers their IDs. *Id.* at ¶ 121. Only then did some Defendants (but not all) put on face masks. *Id.* at ¶ 122.

Despite seeing their IDs, the officers asked if either of them was Joseph Gravelle. *Id.* at ¶ 123. Prokop and Coglianese replied that Gravelle used to live in that house, but had sold it and moved down the street. *Id.* at ¶ 124.

The complaint doesn't reveal how the police responded. But presumably, a light bulb must have gone off. It undoubtedly dawned on the police that maybe they were searching the wrong house, and had handcuffed the wrong person.

The officers wrapped up their search. They asked Prokop and Coglianese if they were injured. *Id.* at ¶ 125. Both said that they were fine. *Id.*

Then, Dominguez (again, the Chief of Police) arrived on the scene and apologized for the errant entry and search. *Id.* at ¶ 126. He said that the raid should not have happened. *Id.* At that point, the officers left. *Id.* at ¶ 127.

## V.     The Effects of the Home Entry

After the adrenaline wore off, Coglianese began experiencing swelling and intense pain in his shoulder. *Id.* at ¶ 128. He went to the doctor for treatment, missing a week of work. *Id.* at

¶¶ 129–30.  Due to the pandemic, Coglianese has not been able to return to a doctor to figure out the extent of the damage to his shoulder.  *Id.* at ¶ 135.

Seven days after the raid, Coglianese was diagnosed with COVID-19.  *Id.* at ¶ 132.  His last known exposure to the virus was 13 days before the search.  *Id.* at ¶ 131.  As a result of his COVID-19 diagnosis, Coglianese had to miss two more weeks of work.  *Id.* at ¶ 133.  He believes that he caught the virus from one of the Defendants.  *Id.* at ¶ 134.

Prokop, on the other hand, has experienced no symptoms and has not been tested for antibodies, so she does not know if she contracted COVID-19.  *Id.* at ¶ 137.  She doesn't allege any physical injuries, but she does claim to suffer from anxiety due to the events.  *Id.* at ¶ 139.

Both Plaintiffs allege that they now live in fear of the Hometown Police Department.  *Id.* at ¶ 140.  As a result, they want to move out of town.  *Id.*

## VI.    Prior Interactions between Prokop and the Hometown Police

The complaint includes allegations about three other times when the police came to Prokop's home, or otherwise heard her address.  *Id.* at ¶¶ 60–61.  The theory appears to be that Prokop told the police where she lived.  Or more precisely, the police knew who lived at 8840 South Ryan Road (*i.e.*, Prokop), and therefore they knew who *didn't* live there (*i.e.*, Gravelle).

The other incidents took place in January 2019, May 2019, and April 2020.  By way of comparison, the wayward search of Plaintiffs' home took place in October 2020.

First, in January 2019, in the middle of the night, a Hometown officer informed Prokop that they were checking on the house because the garage door was left open.  *Id.* at ¶ 62.  Prokop told the officer that it was a mistake and gave him her name.  *Id.* at ¶ 63.  The officer insisted that they go to the garage together to check that nobody had stolen anything, and then left.  *Id.*

Second, around May 19, 2019, an officer responded to a noise complaint when Prokop was hosting a bonfire for a friend's birthday. *Id.* at ¶ 64. The officer reviewed Prokop's ID and gave her a warning. *Id.*

Third, around April 17, 2020, a stray dog walked up to Prokop's home. *Id.* at ¶ 65. She didn't see any tags, so she called the non-emergency number. *Id.* Two officers came, recorded the ID information for both Prokop and Coglianese, and took the dog. *Id.* at ¶ 66. Later that night, one of the officers called Prokop and let her know that the dog belonged to an old resident of 8840 South Ryan Road, and had been returned to its owners. *Id.* at ¶ 67. Prokop believes that the police returned the dog to Joseph Gravelle (and to Terri McDaniels, his "significant other"). *Id.* at ¶¶ 23, 68.

The complaint alleges that the police should have a record of each incident. *Id.* at ¶¶ 62, 64, 69.

## VII.    The Lawsuit

Prokop and Coglianese later filed suit. They brought claims against eight individual officers – Hileman, Dominguez, Lis, Sullivan, Borgens, Casey, Stafira, and Kosmowski – as well as the cities of Hometown and Summit. *Id.* at Counts I–X. Recall that Kosmowski was from the City of Summit. *Id.* at ¶ 13. The rest were from Hometown.

The complaint included ten counts: (1) unlawful seizure during the traffic stop; (2) unlawful search, fabrication of evidence, and illegal entry; (3) false arrest; (4) battery; (5) assault; (6) trespass; (7) intentional infliction of emotional distress; (8) negligent infliction of emotional distress; (9) respondeat superior; and (10) indemnification. There are a lot of Defendants, and a lot of claims, but not all counts are against all Defendants.

11

Defendants filed two motions to dismiss. The Hometown Defendants moved to dismiss some of the claims, and the Summit Defendants moved to dismiss all of the claims. *See* Pls.' Resp. to Hometown Defs.' Mtn. to Dismiss, at 4 (Dckt. No. 25); Summit Defs.' Mtn. to Dismiss (Dckt. No. 43).

In response, Plaintiffs did not file an amended complaint. But they did agree to drop some of their claims. They dropped Defendants Hileman, Dominguez, Sullivan, Borgens, Casey, and Stafira from the battery (Count IV) and assault (Count V) counts. *See* Pls.' Resp. to Hometown Defs.' Mtn. to Dismiss, at 4 (Dckt. No. 25). They also agreed to drop the trespass count (Count VI) in its entirety.[2] *Id.* at 5. Those claims are dismissed.

As things stand, Plaintiffs are alleging the following counts against the following defendants:

> (1) Unlawful traffic stop against Hileman, Dominguez, Lis, Sullivan, Borgens, Casey, Stafira, and Kosmowski (Count I)
>
> (2) Unlawful search of home and seizure of person against Hileman, Dominguez, Lis, Sullivan, Borgens, Casey, Stafira, and Kosmowski (Count II);
>
> (3) false arrest against Hileman, Dominguez, Lis, Sullivan, Borgens, Casey, Stafira, and Kosmowski (Count III);
>
> (4) battery against Lis and Kosmowski (Count IV);
>
> (5) assault against Lis and Kosmowski (Count V);
>
> (6) trespass against Kosmowski (Count VI);

---

[2] The Hometown Defendants moved to dismiss Count VI. In response to that motion, Plaintiffs "agree[d] that Count VI should be dismissed." *See* Pls.' Resp. to Hometown Defs.' Mtn. to Dismiss, at 5 (Dckt. No. 25). The Summit Defendants also moved to dismiss Count VI. But unlike their response to the other motions, Plaintiffs did not agree to drop Count VI against the Summit Defendants. So, as the Court understands the lay of the land, Count VI is a live claim against the Summit Defendants (only).

      (7)     intentional infliction of emotional distress against Hileman, Dominguez, Lis, Sullivan, Borgens, Casey, Stafira, and Kosmowski (Count VII);

      (8)     negligent infliction of emotional distress against Hileman, Dominguez, Lis, Sullivan, Borgens, Casey, Stafira, and Kosmowski (Count VIII);

      (9)     respondeat superior against Hometown and Summit for all the above offenses (Count IX);

      (10)    indemnification by Hometown and Summit for all of the above offenses (Count X).

For all counts, Plaintiffs seek compensatory damages, punitive damages, and attorneys' fees. *See* Cplt., at 29 (Dckt. No. 1).

After that whittling, the pending motions to dismiss involve challenges to some, but not all, claims in the complaint.

The Hometown Defendants moved to dismiss three claims. First, they moved to dismiss Count I (the claim about the traffic stop) against Hileman, Dominguez, Lis, Sullivan, Borgens, and Casey (but not against Stafira). The basic idea is that only Stafira did the traffic stop, so Prokop can't sue anyone else. Second, the Hometown Defendants moved to dismiss the claim of intentional infliction of emotional distress (Count VII) against all Hometown Defendants. Third, they moved to dismiss the claim of negligent infliction of emotional distress (Count VIII) against all Hometown Defendants. They moved to dismiss the demand for punitive damages, too. *See* Hometown Defs.' Mtn. to Dismiss, at 6–7, 10–15 (Dckt. No. 21).

The Summit Defendants moved to dismiss every count (Counts I–X). *See* Summit Defs.' Mtn. to Dismiss, at 4–11 (Dckt. No. 43).

13

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a motion to dismiss, the Court must accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive, the complaint must give the defendant fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

When reviewing a motion to dismiss under Rule 12(b)(6), the court may consider "the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).

## Analysis

The Hometown Defendants and the Summit Defendants filed separate motions to dismiss. The Court will address each motion, one at a time.

## I.    The Hometown Defendants

The City of Hometown and the Hometown police officers moved to dismiss three claims: (1) the Fourth Amendment claim about the traffic stop against Hileman, Dominguez, Lis, Sullivan, Borgens, and Casey (Count I); (2) the intentional infliction of emotional distress claim against all Defendants (Count VII); and (3) the negligent infliction of emotional distress claim

14

against all Defendants (Count VIII).  *See* Hometown Defs.' Mtn. to Dismiss, at 4–11 (Dckt.

No. 21).  They also moved to dismiss the demand for punitive damages.  The Court will address

each in turn.

### A.     Traffic Stop (Count I)

The Hometown Defendants moved to dismiss the claim about the traffic stop against

Hileman, Dominguez, Lis, Sullivan, Borgens, and Casey.  The reason is simple.  Only Officer

Stafira pulled Prokop over.

The complaint includes more than a dozen paragraphs about the traffic stop.  *See* Cplt., at

¶¶ 42–59 (Dckt. No. 1).  Prokop "was stopped by a marked Hometown Police Department squad

car," and "Defendant Officer Stafira was in that Hometown Police Department [s]quad [c]ar."

*Id.* at ¶¶ 44–45.  Stafira told her the reason for the traffic stop, asked for her license, ran her

information, and asked Prokop for her current address.  *Id.* at ¶¶ 46, 49, 53, 54.  He then gave her

a warning.  *Id.* at ¶ 57.

None of the other officers were there.  The complaint does allege that "[o]n information

and belief Defendant Stafira told the other Defendant Officers of what had occurred at the traffic

stop and had told them that Plaintiff Prokop resided at 8840 S. Ryan Road."  *Id.* at ¶ 58.  But

notice the past tense.  Stafira told the other officers what "had occurred" at the traffic stop.  *Id.*

There's no allegation that any of those officers participated in the stop.  And there's no

allegation that the other officers coaxed Stafira to pull over Prokop, or directed him to do so, or

otherwise participated in any way.

There is nothing else in the complaint tying the other Defendants to the traffic stop.  The

only possible exception is the generic allegation that Stafira was "acting in concert with all other

defendants" when he conducted the stop. *Id.* at ¶ 155. But that's it. A conclusory allegation doesn't count.

To succeed on a section 1983 claim, "[p]laintiffs must show that the defendants were personally responsible for the deprivation of their rights." *Wilson v. Warren County*, 830 F.3d 464, 469 (7th Cir. 2016). "[S]ome causal connection or affirmative link between the action complained about and the official sued is necessary for § 1983 recovery." *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). "Plaintiffs must allege more than mere negligence – they must show that the defendant knew that the primary actor 'was acting wrongfully and facilitated it, approved it, condoned it, or turned a blind eye.'" *Molina v. Latronico*, 430 F. Supp. 3d 420, 437 (N.D. Ill. 2019) (Dow, J.) (quoting *Pepper v. Village of Oak Park*, 430 F.3d 805, 811 (7th Cir. 2005)).

The complaint does not allege that the other Defendants participated in the traffic stop, so it fails to state a claim. Count I against Hileman, Dominguez, Lis, Sullivan, Borgens, and Casey is dismissed.

That said, there might be more to the story. In her response brief, Prokop asked for leave to amend the complaint to add three new allegations. *See* Pls.' Resp. to Hometown Defs.' Mtn. to Dismiss, at 4 (Dckt. No. 25). Specifically, Prokop seeks to add the following: (1) "[w]hile defendant officers were surveilling 8840 S. Ryan Road on October 30, 2020, defendant officers observed plaintiff Prokop leave 8840 S. Ryan Road in her vehicle;" (2) "Defendant Stafira was part of the surveillance team;" and (3) "[a]fter defendant officers observed Prokop leave 8840 S. Ryan Road, they directed defendant Stafira to follow Prokop and stop her." *Id.*

So, maybe the other Defendants directed Prokop to make that traffic stop after all. If Prokop has a factual basis to allege that the other Defendants directed the traffic stop, then she

can amend the complaint to add that allegation. The Court grants Plaintiffs leave to file an amended complaint no later than two weeks after entry of this Order.

### B. Intentional Infliction of Emotional Distress (Count VII)

The Hometown Defendants argue that Prokop and Coglianese failed to plead a claim of intentional infliction of emotional distress. *See* Hometown Defs.' Mtn. to Dismiss, at 10–13 (Dckt. No. 21).

"Under Illinois law, a plaintiff may recover damages for intentional infliction of emotional distress only if she establishes that (1) the defendant's conduct was truly extreme and outrageous; (2) the defendant intended to inflict severe emotional distress (or knew that there was at least a high probability that its conduct would cause severe emotional distress); and (3) the defendant's conduct did in fact cause severe emotional distress." *Richards v. U.S. Steel*, 869 F.3d 557, 566 (7th Cir. 2017) (citing *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 278 Ill. Dec. 228, 798 N.E.2d 75, 80 (2003)); *see also Ulm v. Mem'l Med. Ctr.*, 2012 IL App (4th) 110421, 357 Ill. Dec. 953, 964 N.E.2d 632, 641 (2012). Negligence isn't enough, because negligence isn't intentional conduct. *See, e.g.*, *Kawaauhau v. Geiger*, 523 U.S. 57, 61–62 (1998) (noting that "[i]ntentional torts generally require that the actor intent 'the consequences of an act,'" while "negligent or reckless torts" require "simply 'the act itself'") (emphasis omitted) (quoting Restatement (Second) of Torts § 8A, cmt. A (1964)).

First, the Hometown Defendants argue that Plaintiffs have not alleged outrageous conduct. "[T]o qualify as outrageous, the nature of the defendant's conduct must be so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized community." *Feltmeier*, 798 N.E.2d at 83. Courts conduct an objective, fact-based inquiry and "often consider the degree of power or authority which a defendant has over a plaintiff; whether

the defendant reasonably believed that his objective was legitimate; and whether the plaintiff is particularly susceptible to emotional distress." *Gross v. Chapman*, 475 F. Supp. 3d 858, 864 (N.D. Ill. 2020) (cleaned up).

Read in a light favorable to the Plaintiffs, the complaint contains enough – *just* enough – factual material about potentially outrageous conduct to go forward. The Federal Rules impose low hurdles for pleadings, and this complaint slips over the barrier, by the skin of its teeth.

First, Defendants failed to verify where Gravelle lived. The police accepted the claim by John Doe that Gravelle lived at 8840 South Ryan Road, but they didn't take any steps to doublecheck that address. *See* Cplt., at ¶¶ 70–75 (Dckt. No. 1). And based on other interactions with Prokop, the police had reason to believe that she lived there.[3] *Id.* at ¶¶ 60–69. Those allegations sound like negligence – and again, negligence isn't enough. But maybe the facts will shed more light.

Second, shortly before the entry, the officers learned more information that might have called into question who lived at 8840 South Ryan Road. A few hours before the entry, Stafira – who participated in planning the entry, too – pulled Prokop over and learned her address. *Id.* at ¶¶ 42–59. And, while staking out the house, the officers would have seen Prokop and Coglianese making dinner, too. *Id.* at ¶ 80. Again, the fact that Prokop and Coglianese lived there doesn't mean that Gravelle *didn't* live there. But it's a datapoint.

Third, right before knocking on the door, the officers could have seen that there were no marijuana plants in the garage. *Id.* at ¶¶ 33, 83–86, 90–91, 112. That's not much, but it's something.

---

[3] Knowledge that Prokop lived at 8840 South Ryan Road is not the same thing as knowing that Gravelle *didn't* live there. They're not mutually exclusive. True, Prokop and Gravelle have different last names. But then again, so do Prokop and Coglianese, and they live together.

Taken together, that conduct may not rise to the level of conduct that is "truly extreme and outrageous." *See Richards*, 869 F.3d at 566. Still, there is little harm in allowing the claim to go forward, because Defendants moved to dismiss only some of the claims, so discovery about the incident will go forward anyway. The claim may not be long for this world. But for now, it survives.

The viability of the claim will depend on the facts. Did all of the officers actually know that Prokop lived at 8840 South Ryan Road? Did they know about the incidents involving the open garage door (in January 2019), the noisy bonfire (in May 2019), or the stray dog (in April 2020)? *See* Cplt., at ¶¶ 62–69 (Dckt. No. 1). And more importantly, did any of the officers know that Gravelle *didn't* live at 8840 South Ryan Road? Did the officers fail to doublecheck the address, and if so, was that failure anything more than negligence?

Time will tell. And it's time for discovery.

The Hometown Defendants make one other argument. They point out that, as soon as they learned that Gravelle lived down the street, they ceased executing the warrant, apologized, and left. *See* Hometown Defs.' Mtn. to Dismiss, at 12 (Dckt. No. 21); *see also* Cplt., at ¶¶ 126–27 (Dckt. No. 1). In their view, that reaction is inconsistent with acting with intent to inflict extreme emotional distress or knowledge of the high probability of extreme emotional distress. *See Richards*, 869 F.3d at 566.

Not so. A person can act with intent, and later apologize. They're not mutually exclusive. People apologize for intentional conduct all the time (but less often than they should).

The Court denies the Hometown Defendants' motion to dismiss Plaintiffs' intentional infliction of emotional distress claim.

## C.     Negligent Infliction of Emotional Distress (Count VIII)

The Hometown Defendants also moved to dismiss the claim of negligent infliction of emotional distress under the Illinois Tort Immunity Act.  *See* Hometown Defs.' Mtn. to Dismiss, at 14–15 (Dckt. No. 21).

As the name reveals, a claim of negligent infliction of emotional distress is about negligence.  But the Illinois Tort Immunity Act protects public employees from negligence claims.  "A public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful or wanton conduct."  *See* 745 ILCS 10/2-202.  "Because negligence is by definition a lesser state of mind than willful and wanton, 'negligence claim[s are] barred by the Illinois Tort Immunity Act.'"  *Tyagi v. Sheldon*, 2017 WL 4130532, at *20 (N.D. Ill. 2017) (citation omitted) (collecting cases).[4]

True, the statute is an affirmative defense, and plaintiffs do not need to plead around affirmative defenses in their complaints.  *See Hyson USA, Inc. v. Hyson 2U, Ltd.*, 821 F.3d 935, 939 (7th Cir. 2016).  But here, delaying dismissal would merely delay the inevitable.  Defendants

---

[4] Even if the Tort Immunity Act did not bar the claim, the Court would still dismiss the claim for Prokop. "Generally, to state a claim for negligent infliction of emotional distress, a plaintiff must allege the traditional elements of negligence:  duty, breach, causation, and damages."  *Schweihs v. Chase Home Fin., LLC*, 2016 IL 120041, 412 Ill. Dec. 882, 77 N.E.3d 50, 58 (2016).  After those basic elements, Illinois courts then draw a "distinction between a direct victim and a bystander."  *Id.*  A direct victim must satisfy the "impact rule" by showing that "he suffered (1) emotional distress and (2) a contemporaneous physical injury or impact."  *Id.* (cleaned up).  Meanwhile, a bystander must satisfy the "zone-of-physical danger rule" by showing he was "in a zone of physical danger and . . . because of the defendant's negligence, [had] reasonable fear for his own safety . . . ."  *Id.* (cleaned up).  Prokop alleged that she was present in the home when Defendants executed the warrant, entered her house, and fought with Coglianese.  *See* Cplt., at ¶¶ 94–113 (Dckt. No. 1).  That is, she was in the same location as Coglianese, who suffered physical injury.  This adequately alleges the zone of danger.  But Prokop has only alleged that she "continues to suffer anxiety from the events of the illegal raid."  *Id.* at ¶ 139.  A plaintiff need not "suffer a physical impact or injury at the time of the negligent act," but she "must show *physical* injury or *illness* as a result of the emotional distress, caused by the defendant's negligence and not a contemporaneous physical injury or impact."  *Schweihs*, 77 N.E.3d at 58 (emphasis added).  Prokop alleges emotional distress (her anxiety), but no physical manifestations of that distress.  So, the Court would dismiss this claim anyway.

have invoked the defense, and there's no way around it. "[B]ecause the Tort Immunity Act immunizes the Defendant Officers' liability for negligent conduct, any repleading would be futile." *Winn v. City of Chicago*, 2022 WL 80272, at *6 (N.D. Ill. 2022).

The Court grants the Hometown Defendants' motion to dismiss the negligent infliction of emotional distress claim with prejudice.

### D. Punitive Damages

Finally, the Hometown Defendants make a state-law procedural argument about punitive damages. Illinois law requires a pretrial motion and a hearing before an award of punitive damages. *See* Hometown Defs.' Mtn. to Dismiss, at 15 (Dckt. No. 21). That hasn't happened, so the Hometown Defendants ask this Court to throw out the demand for punitive damages. *Id.*

Illinois law states that "[i]n all actions on account of bodily injury or physical damage to property, based on negligence . . . where punitive damages are permitted no complaint shall be filed containing a prayer for relief seeking punitive damages." *See* 735 ILCS 5/2-604.1. Instead, "a plaintiff may, pursuant to a pretrial motion and after a hearing before the court, amend the complaint to include a prayer for relief seeking punitive damages." *Id.* A court must allow amendment "if the plaintiff establishes at such hearing a reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages." *Id.*

Basically, state law imposes procedural requirements before a plaintiff can seek punitive damages. That argument might have legs if this case were in state court. But this case is in federal court, so federal procedural rules apply. The law "is procedural and does not apply" in federal court. *See Audia v. Briar Pl., Ltd.*, 2018 WL 1920082, at *5 n.6 (N.D. Ill. 2018); *see also MCI Worldcom Network Servs., Inc. v. Big John's Sewer Contractors, Inc.*, 2003 WL 22532804, at *3 (N.D. Ill. 2003) (collecting cases).

The Court denies the Hometown Defendants' motion to dismiss the demand for punitive damages.

## II.     The Summit Defendants

Kosmowski and the City of Summit moved to dismiss all ten counts against them.  *See* Summit Defs.' Mtn. to Dismiss (Dckt. No. 43).  Before turning to the merits, the Court must take care of two housekeeping chores.

First, the Summit Defendants seek a dismissal with prejudice because, in their view, the complaint does not include sufficient facts to support a claim.  But a dismissal with prejudice is a dismissal on the merits.  District courts typically allow at least one opportunity to file an amended complaint before dismissal with prejudice.  *See O'Brien v. Village of Lincolnshire*, 955 F.3d 616, 628 (7th Cir. 2020).  And the Plaintiffs here have filed only one complaint.  So, the time is not right for a dismissal with prejudice.

Second, the Summit Defendants invoked federal procedural rules and state procedural rules in their motion to dismiss.  *See, e.g.*, Pls.' Resp. to Summit Defs.' Mtn. to Dismiss, at 9–10 (Dckt. No. 47) (invoking the pleading standards under 735 ILCS 5/2-619(a)(9)).  They relied on federal procedure for the federal claims, and state procedure for the state claims.

Federal courts apply federal procedural rules.  The Federal Rules of Civil Procedure govern all claims in federal court.  The substance of the claims makes no difference.  Federal procedure applies to federal claims and to state claims, too.  "[F]ederal courts in diversity cases (and any other cases in which state law supplies the rule of decision) apply state 'substantive' law but federal 'procedural' law."  *Gacek v. Am. Airlines, Inc.*, 614 F.3d 298, 301 (7th Cir. 2010).  "[I]t is not the substantive or procedural nature or purpose of the affected state law that

matters, but the substantive or procedural nature of the Federal Rule." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 410 (2010).

With those two housekeeping matters aside, the Court turns to the Summit Defendants' motion to dismiss.

## A.     Federal Law Claims (Counts I–II)

The Summit Defendants moved to dismiss the first two claims based on qualified immunity. They argue that Kosmowski receives qualified immunity for his actions, and that Summit cannot be liable if Kosmowski is not liable. *See* Summit Defs.' Mtn. to Dismiss, at 5 (Dckt. No. 43).

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "[D]ismissal under Rule 12(b)(6) can preserve an official's right, under qualified-immunity doctrine, 'not to stand trial or face the other burdens of litigation,' including pretrial discovery." *Hanson v. LeVan*, 967 F.3d 584, 589 (7th Cir. 2020) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

Qualified immunity depends on the facts. *See Hardeman v. Curran*, 933 F.3d 816, 823 (7th Cir. 2019) (explaining that qualified immunity "closely depends" on the facts of the case); *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009) (assessing defendant's conduct "in light of the particular circumstances" he faced). The Court asks whether "*particular* conduct" violated a clearly established right "in light of the specific context of the case, not as a broad general proposition." *Leiser*, 933 F.3d at 702 (emphasis in original) (cleaned up); *see Mullenix v. Luna*, 577 U.S. 7, 12 (2015) ("The dispositive question" for qualified immunity is "whether

the violative nature of *particular* conduct is clearly established.") (emphasis in original) (cleaned up).

"While qualified immunity is an affirmative defense, once raised, the burden shifts to the plaintiff to defeat it." *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019). To meet that burden, the plaintiff must "demonstrate[] that the official violated a statutory or constitutional right *and* that the right was 'clearly established' at the time of the challenged conduct." *Howell v. Smith*, 853 F.3d 892, 897 (7th Cir. 2017) (emphasis in original) (citation omitted).

The Summit Defendants argue that Kosmowski executed a valid search warrant, so he deserves qualified immunity. *See* Summit Defs.' Mtn. to Dismiss, at 5 (Dckt. No. 43). They cite a string of cases that allegedly declare police officers "immune from liability" when executing a facially valid warrant.[5] *Id.* This formulation is less an argument for qualified immunity, and more a claim that Plaintiffs did not plead a Fourth Amendment violation at all. Nevertheless, the invocation of the defense is enough, and the burden shifts to Plaintiffs to provide case law showing that the conduct violated a clearly established right.

Prokop and Coglianese respond with two arguments.

First, they contend that the warrant was illegible, and Kosmowski did not read it, so he could not rely on it in good faith. *See* Pls.' Resp. to Summit Defs.' Mtn. to Dismiss, at 6–7 (Dckt. No. 47).

Plaintiffs have not carried their burden of showing that Kosmowski violated clearly established law. Plaintiffs rely on cases from different districts, circuits, and states. "'In determining whether a right is 'clearly established,' [the Court] look[s] first to controlling

---

[5] As an aside, none of the cases that the Summit Defendants cite held that the officers were "immune from liability." They are each criminal appeals, in which a court ruled evidence admissible because the police obtained it in accordance with the Fourth Amendment.

precedent on the issue from the Supreme Court and from [the Seventh] [C]ircuit'. If such precedent is lacking, [the Court] look[s] to all relevant case law to determine 'whether there was such a clear trend in the case law that [the Court] can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time.'" *Phillips v. Cmty. Ins. Co.*, 678 F.3d 513, 528 (7th Cir. 2012) (citations omitted).

There is no clear trendline. Plaintiffs offer only one case about an illegible warrant. It came from a different district (the Eastern District of Virginia) nearly two decades ago. *See Freedman v. Am. Online, Inc.*, 325 F. Supp. 2d 638 (E.D. Va. 2004). And the facts were much different.

*Freeman* involved a warrant application that was signed by the police, but not by a judge. *Id.* at 641 ("The juxtaposition of these words and Detective Bensey's signature might lead a reader to assume, incorrectly, that Detective Bensey's signature is that of a judge. But careful review of the form discloses that there is a line below the words 'Signed (Judge of the Superior Court)' that is meant for the judge's signature and this line is blank. Nor is the form signed anywhere else by a judge. Moreover, no signature, including that of Detectives Young and Bensey, appears on page five, even though the warrant appears to require the signature of a judge on that page."). So it wasn't a warrant.

That's not this case. The police here had a lawful warrant. A judge signed it. In fact, the complaint acknowledges that the police "obtained a search warrant" for 8840 South Ryan Road. *See* Cplt., at ¶ 158 (Dckt. No. 1); *see also id.* at ¶¶ 39, 96, 99–100, 105, 153, 170.

The illegibility of the warrant does not undermine the existence of the warrant. The lawfulness of the warrant does not depend on its readability. In fact, the police do not have to show the warrant at all, which necessarily means that they don't have to show a *legible* warrant.

25

*See United States v. Sims*, 553 F.3d 580, 584 (7th Cir. 2009) ("[N]othing in the amendment requires that the warrant be shown to the person whose premises are to be searched. As a matter of prudence, police will show a search warrant to the person whose premises are to be searched if he questions their authority to conduct the search. But they do not have to.").

Plaintiffs have not come forward with clearly established law that a police officer cannot conduct a search if the police arrive at the home with a warrant that is illegible. So qualified immunity applies.

Second, Plaintiffs argue that Kosmowski (and the other officers) learned facts after receiving the warrant that destroyed probable cause. Plaintiffs cite a footnote from a Supreme Court opinion, which noted that "probable cause may cease to exist after a warrant is issued. The police may learn, for instance, that contraband is no longer located at the place to be searched." *United States v. Grubbs*, 547 U.S. 90, 96 n.2 (2006).[6]

The argument rests on the absence of marijuana plants in the garage. John Doe said that, on the day before the search, he saw 6–10 plants in the garage, and that they were 3–4 feet tall. *Id.* at ¶ 34. But on the day of the search, there were no marijuana plants in the garage. And the officers could have seen that they weren't there. The garage door was open, and the garage was in plain view. *See* Cplt., at ¶¶ 90–91 (Dckt. No. 1).

As Plaintiffs see it, the warrant rested on the fact that there were marijuana plants in the garage. But the police could have seen that there were no marijuana plants. So, in their view, probable cause for a search no longer existed. Without plants, there's no probable cause.

---

[6] They also cite a Washington Supreme Court case and a D.C. Circuit case, but as explained above, those cases do little to clearly establish law in this district.

That argument faces a number of problems. For starters, the application for the warrant was not limited to marijuana plants in the garage. John Doe divulged that Gravelle "uses the house to store synthetic heroin and steroids." *Id.* at ¶ 34. So there was an independent basis to search the home, even if the marijuana plants were not in the garage.

The warrant was not confined to the garage, either. It authorized a "search [of] Joseph Gravelle and the premises of 8840 S. Ryan Rd." *Id.* at ¶ 31. Premises include "[a] house or building, along with its ground." *See Premises*, Black's Law Dictionary (11th ed. 2019). The warrant covered the premises, and the premises included the house.

Based on the information from the informant, there was probable cause to search the home. "Law enforcement officials have probable cause to search a particular place where 'the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found.'" *United States v. Aljabari*, 626 F.3d 940, 944 (7th Cir. 2010) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). The sufficiency determination is based on the "totality of the circumstances known at the time a warrant is requested. Those circumstances need only indicate a reasonable probability that evidence of crime will be found in a particular location; neither an absolute certainty nor even a preponderance of the evidence is necessary." *Id.* (citation omitted).

The fact that the marijuana plants were not in the garage was not especially noteworthy. According to John Doe, the marijuana plants were only 3–4 feet tall. They weren't sequoias. They were mobile. Someone could have easily picked them up, and taken them inside the home.

Also, Plaintiffs did not allege that Kosmowski had any role in obtaining the search warrant. So, unlike the Hometown Defendants, Kosmowski entered the home solely based on the contents of warrant, not based on what the informant told the officers. That is, nothing in the

complaint alleges that Kosmowski had any reason to know that the drugs were exclusively in the garage.

Based on the allegations in the complaint, the totality of the circumstances at the time of Kosmowski's entry suggest "a reasonable probability" that the drugs might be in the house. The warrant did not expire when the officers saw the garage was empty, and it allowed them to search the house for the drugs. As a result, he acted pursuant to a valid search warrant, and Plaintiffs provided no case law to suggest their actions exceeded clearly established law. So, Kosmowski is entitled to qualified immunity on Count I.

The Summit Defendants also moved to dismiss Count II (the traffic stop) on qualified immunity grounds, too. But there is a more basic problem. The complaint does not allege that Kosmowski or anyone else from Summit participated in the traffic stop. So there is no claim.

The Court grants the Summit Defendants' motion to dismiss Counts I and II.

**B.      State Law Claims (Counts III–X)**

The Summit Defendants also moved to dismiss all eight state law claims: false arrest (Count III), battery (Count IV), assault (Count V), trespass (Count VI), intentional infliction of emotional distress (Count VII), negligent infliction of emotional distress (Count VIII), respondeat superior (Count IX), and indemnification (Count X). *See* Summit Defs.' Mtn. to Dismiss, at 7 (Dckt. No. 43).

Their only argument is that the Illinois Tort Immunity Act protects Kosmowski (and therefore Summit) from liability. *Id.* Specifically, they argue that Plaintiffs have failed to plead any facts suggesting that Kosmowski's actions were willful and wanton. *Id.* at 8.

As discussed above, the Illinois Tort Immunity Act states that "[a] public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or

28

omission constitutes willful and wanton conduct." *See* 745 ILCS 10/2-202. The Act defines

willful and wanton conduct as "a course of action which shows an actual or deliberate intention

to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard

for the safety of others or their property." *See* 745 ILCS 10/1-210. The conduct must be "more

than mere inadvertence, incompetence, or unskillfulness." *Stevenson v. City of Chicago*, 2018

WL 1784142, at *32 (N.D. Ill. 2018). Additionally, "[a] local public entity is not liable for an

injury resulting from an act or omission of its employee where the employee is not liable." *See*

745 ILCS 10/2-109.

But overcoming the Illinois Tort Immunity Act is not part of the plaintiff's case in chief.

The Illinois Tort Immunity Act is an affirmative defense, and a plaintiff does not have to plead

around affirmative defenses. *See Sterling v. Bd. of Educ. of Evanston Twp. High Sch. Dist. 202*,

2021 WL 809763, at *7 (N.D. Ill. 2021) ("[The Tort Immunity Act] provides affirmative

defenses, and plaintiffs generally need not anticipate and overcome affirmative defenses in their

complaint."); *Doe v. Sch. Dist. U-46*, 2021 WL 3849635, at *10 (N.D. Ill. 2021); *Khan v. Bd. of

Educ. of City of Chicago*, 2018 WL 6192186, at *7 (N.D. Ill. 2018). "As a general rule,

'[w]hether conduct is willful and wanton is a factual question.'" *Grimes v. County of Cook*, 455

F. Supp. 3d 630, 643 (N.D. Ill. 2020) (quoting *Carter v. Simpson*, 328 F.3d 948, 951 (7th Cir.

2003)).

That said, the Court does dismiss the negligent infliction of emotional distress claim

against Kosmowski. Negligence is, by definition, less than wanton and willful. *See* 745 ILCS

10/2-202; *Tyagi*, 2017 WL 4130532, at *20 (collecting cases); *Winn*, 2022 WL 80272, at *6. It

is inevitable that a negligence-based claim will fail, because Defendants have asserted an

affirmative defense showing that they can't be liable for mere negligence. The Court dismisses that count with prejudice.

The Court grants the Summit Defendants' motion to dismiss Count VIII (negligent infliction of emotional distress) with prejudice. The Court denies the Summit Defendants' motion to dismiss Counts III–VII and IX–X.

## Conclusion

For the foregoing reasons, the Court grants in part and denies in part the Hometown Defendants' motion to dismiss. The Court grants in part and denies in part the Summit Defendants' motion to dismiss.

Date:   March 2, 2022

 

Steven C. Seeger
United States District Judge